M. DeMatteo Construction Company *vs.* Common-wealth.

Suffolk.    November 6, 1958. — February 27, 1959.

Present: Wilkins, C.J., Spalding, Williams, Counihan, & Whittemore, JJ.

*Contract,* Building contract, Construction, Modification, With Common-wealth.   *Practice, Civil,* Exceptions: what is subject to exception, what questions open; Auditor: findings; Requests, rulings and in-structions.   *Evidence,* Auditor's report.   *Commonwealth,* Contracts.

An exception to the general finding in an action heard without jury does not raise the question whether that finding was permissible as matter of law unless all the subsidiary facts on which it was based are estab-lished.   [572]

Unless the judge in an action heard without jury purports to make express findings of all the material facts, his general finding imports a finding of all subsidiary facts and a drawing of all permissible inferences in sup-port of it.   [572]

A general finding by an auditor whose findings are not final is not invali-dated by absence of any subsidiary findings to support it, and is evi-dence at the trial unless contradicted by such subsidiary findings as are made by him.   [572–573]

Nothing in a construction contract with the Commonwealth or in G. L. c. 29, § 20A, required that an order for extra work, under an article providing that the "contractor . . . [should] do any work not herein otherwise provided for when and as ordered in writing by the [Com-monwealth's] engineer, such written order to contain particular refer-ence to this article," be given before the commencement of the extra work.   [582–583]

Where, during the performance of a construction contract with the Com-monwealth for a large project including a viaduct, the steel framework of a span of the viaduct competently built by the contractor in accord-ance with the plans and specifications collapsed through no fault of his but because of an error in design and an emergency was created requir-

M. DeMatteo Construction Co. *v.* Commonwealth.

ing substantial reconstruction work on the viaduct in accordance with revised designs, which was done by the contractor as extra work under an order therefor by the Commonwealth's representatives, nothing in the circumstances required a conclusion that the redesigns were such a departure from the original designs of the viaduct and the reconstruction work so extensive in nature and cost that the reconstruction work could not legally be done as extra work but should have been provided for by a new and separate contract let after competitive bidding pursuant to G. L. c. 29, § 8A. [584]

In an action heard without jury, a granting of requests for rulings "in so far as said requests are not inconsistent with the court's findings" was meaningless in the absence of any specific findings by the judge and the requests must be treated as denied. [585-586]

A judge hearing an action without jury should have granted a request for ruling which, even if not strictly accurate, was sufficient in form to direct his attention to the substance of a fundamental issue. [587-588]

Payment for additional costs incurred by the contractor under a construction contract with the Commonwealth by reason of changes increasing the work ordered by its engineer with respect to matters for which unit prices were not provided in the contract was governed by articles therein pertaining to "extra work," defined as "work or materials for which no price agreement is contained in the contract," and prescribing certain procedures as a condition precedent to payment, rather than by articles permitting the engineer to order "alterations" and providing for remuneration of the contractor for any resulting increase in the work "at the contract unit prices." [588-589]

Where the contractor under a construction contract with the Commonwealth fabricated in accordance with the specified design certain forms which "had to be discarded" by reason of a change in the design requiring the fabrication of new forms, and received no payment for the discarded forms at the unit prices provided in the contract for the forms because such prices covered only forms actually used, his compensation for fabricating the discarded forms was governed by an article in the contract pertaining to "extra work" and prescribing certain procedures as a condition precedent to payment on a claim for compensation for certain "extra work . . . or for any damage sustained," rather than by articles permitting the Commonwealth's engineer to order "alterations" and providing for remuneration of the contractor for any resulting increase in the work "at the contract unit prices." [589-590]

Work done by the contractor under a construction contract with the Commonwealth in excavating gravel previously placed by him as a safety measure on order of the Commonwealth's representatives given during the performance of the contract could properly be found to be compensable under items of the contract providing for his doing "all other excavation necessary for the performance" and for payment therefor at the unit price specified for "unclassified excavation," rather than under articles of the contract relating to extra work. [590-591]

Under a construction contract with the Commonwealth providing in an

article dealing with extra work that the contractor should do such work on written order by the Commonwealth's engineer containing "particular reference to this article" and that if the contractor claimed compensation for extra work "not [so] ordered" he must file certain statements relating to the work with the engineer, a claim by the contractor for extra work was barred where, although there was a written order for the work, it did not refer to such article of the contract and the contractor failed to file the required statements with the engineer. [591–592]

Evidence warranted a finding that where, after the making of a construction contract with the Commonwealth including the construction of a manhole at a lump sum price, substantial changes in the design thereof were made, the changes did not entirely eliminate the original work specified respecting the manhole and constitute an omission thereof, as contended by the Commonwealth, but constituted an "alteration" whereby the contractor was entitled to payment of the lump sum price less a decrease in his costs resulting from the changes. [592–593]

PETITION, filed in the Superior Court on October 18, 1954.

The case was heard by *Dewing*, J., on an auditor's report and other evidence.

*Samuel H. Cohen*, Assistant Attorney General, (*James J. Kelleher* with him,) for the Commonwealth.

*Herman Snyder*, (*Richmond I. Bailen* with him,) for the petitioner.

WILKINS, C.J.   This petition pursuant to G. L. c. 258 is to recover for work done under a contract with the Commonwealth, acting through the department of public works, for the building of structures and roadways in the Sullivan Square area of Boston.   The work was part of an accelerated highway program authorized by St. 1949, c. 306.   The performance of the entire contract involved the widening of Rutherford Avenue and of Alford Street; the revision of a traffic circle in Sullivan Square and of structures of the Metropolitan Transit Authority;   and the construction of the following:  new streets from Main Street to Cambridge Street and from Mystic Avenue to Broadway, Somerville;  a depressed highway, known as the low level road, from Rutherford Avenue to Alford Street; a viaduct from Rutherford Avenue to Mystic Avenue;  a railroad bridge across Rutherford Avenue;  and a pedestrian overpass.

The recovery sought is in two parts:  (1) The sum of

$195,794.32 for reconstructing in accordance with a redesign a part of the viaduct after the fall of a span of its steel framework, which had been erected as part of the work under the contract. This sum is the amount of an extra work order prepared and certified by the chief engineer of the department. (2) The sum of $261,983.09 for miscellaneous items of extra work; for damages; and for work performed for which no compensation has been paid. The case was referred to an auditor, whose findings of fact were not to be final. The case was tried on the auditor's report and on other evidence before a judge, who found for the petitioner on both parts of the case.[1]

The case has a somewhat complicated procedural history. Before the auditor there were three witnesses, all called by the petitioner: a deputy comptroller of the Commonwealth; Martin J. DeMatteo, Junior, president of the petitioner; and one Reidy, an engineering expert. Before the judge a score of witnesses testified. The petitioner offered in evidence the auditor's report, the contract, and the standard specifications (more fully described below), and rested. There followed in order the respondent's evidence and the petitioner's evidence in rebuttal on the first part of the case; and the respondent's evidence and the petitioner's evidence in rebuttal on the second part of the case.

When the auditor's report was admitted in evidence, the respondent, pursuant to G. L. c. 221, § 56, filed a motion to exclude certain findings, which the judge took under advisement. The respondent presented eighty-four requests for rulings. When the judge filed his findings, three requests relating to burden of proof were granted. At the same time he granted twenty-two requests "in so far as said requests are not inconsistent with the court's findings," and denied the rest. To this the respondent excepted, as well as to (1) the "findings of the court" in the several paragraphs of the decision, and (2) the failure of the judge to act upon

---

[1] The judge's finding on the first part of the case was in the sum of $195,794.32 (as found by the auditor) with interest from December 23, 1953. His finding on the second part was for $260,394.90 (the same as the auditor) with interest from the date of the petition.

the motion to exclude findings. The respondent filed a motion for a new trial, which was denied. At the same time the judge reversed his action on request numbered 25, which had previously been granted in so far as not inconsistent with the findings, and request 29 which had been denied, and granted them without qualification. See *Wolfe* v. *Laundre*, 327 Mass. 47.

The exceptions to the findings are applicable to both parts of the case. An exception to a general finding, other than in unusual cases of which this is not one (see *Leshefsky* v. *American Employers' Ins. Co.* 293 Mass. 164, 166–167), is not sufficient to bring before us for review an implied ruling that such a finding is permissible as matter of law. *Sreda* v. *Kessel*, 310 Mass. 588, 589, and cases cited. *Matter of Loeb*, 315 Mass. 191, 194. *Barton* v. *Cambridge*, 318 Mass. 420, 424. *DiCicco* v. *Graphic Mach. Corp.* 329 Mass. 695, 696. *Fain* v. *Fitzhenry-Guptill Co.* 335 Mass. 6, 9.

It is a general rule that a judge's general and special findings are to stand if warranted upon any possible view of the evidence. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 143–144, and cases cited. In an action at law the duty of drawing proper inferences from the evidence rests upon the fact finding tribunal, and, unless a judge in a case heard without jury purports to make a complete statement of the case, his general finding imports a finding of all subsidiary facts and the drawing of all permissible inferences in its support. *Jones* v. *Clark*, 272 Mass. 146, 149. *Matter of Loeb*, 315 Mass. 191, 196. *New York Cent. R.R.* v. *Marinucci Bros. & Co. Inc.* 337 Mass. 469, 471–472. At the hearing before the judge the auditor's general finding on either part of the case, unless vitiated by his subsidiary findings, was prima facie evidence warranting a finding for the petitioner. G. L. c. 221, § 56. *Epstein* v. *Simco Trading Co. Inc.* 297 Mass. 282, 283. See *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 567. "Its quality as such evidence is not affected by the fact that it is not supported by subsidiary findings (unless purporting to rest upon such findings), since the general finding imports findings of subsidiary facts essen-

M. DeMatteo Construction Co. *v.* Commonwealth.

tial to the conclusion; 'it is enough if they do not contradict it.' " *Rosenblum* v. *Ginis*, 297 Mass. 493, 496. *Brooks* v. *Davis*, 294 Mass. 236, 237–238. *Murphy* v. *Smith*, 307 Mass. 64, 68. In other words, the report would not be discredited by the absence of subsidiary findings.

THE FIRST PART OF THE CASE.

We first recite certain facts found by the judge. The department of public works awarded the contract, known as No. 4477, to the petitioner, the lowest bidder, on December 30, 1949. Plans and documents pertaining to the fabrication and erection of overhead structures, including the viaduct, had been prepared by the department. The fabrication and erection were performed by Lehigh Structural Steel Company (herein called Lehigh), a subcontractor selected by the petitioner and approved in writing by the department. The department had engineers and inspectors on the job to supervise and advise. On May 22, 1952, there was a collapse of a portion of the viaduct. The collapse was of the entire northwesterly end of span 15, which had been supported on rockers located at the top of bent 16.

The judge adopted these findings of the auditor: The respondent "prepared an extra work order, No. 57, in the amount of $195,794.32. This order was on the form specified in the contract [and] executed as provided therein. This was approved by the chief engineer of the department of public works on December 23, 1953, and was signed by the principal civil engineer . . . . It was then filed on December 24, 1953, together with the notice of intention[1] in the office of the comptroller of the Commonwealth, and was approved by the commissioners of public works on January 5, 1954." It appears from an exhibit certified by the judge that on May 11, 1954, the department voted to rescind the approval given on January 5, 1954.

The judge found: "On June 2, 1954, the commissioners of public works voted to approve the work done by the peti-

---

[1] See G. L. c. 29, § 20A, *infra.*

tioner . . . and on June 15, 1954, sent the petitioner an official notice of this approval in the amount of $195,794.32." The statement as ·to what happened on the latter date is erroneous. The auditor's report, from which the quotation is sought to be taken, reads, "on June 15, 1954, [the commissioners] sent the petitioner an official notice of this approval but the extra work order for $195,794.32 was not paid." What actually occurred appears from exhibits certified by the judge. On June 15, 1954, the commissioners notified the petitioner that at their meeting held on that day they voted to approve as of June 2, 1954, the work under contract No. 4477, "the engineer having reported that the work called for by said contract has been completed." A final estimate, approved November 17, 1955, was sent by the department to the petitioner. This showed that the original bid was $4,133,550; that previous payments totaled $5,640,993.78; that the "value of work to date" was $5,778,452.20; and that a further payment of $137,458.42 was due. There was no reference to extra work order No. 57 or to the item of $195,794.32.

We summarize other findings of the judge. The petitioner was required to follow strictly and without deviation, unless expressly authorized, the plans and specifications submitted to it by the respondent. It was obligated to accept the plans, any redesigns of them, any new plans, and any alterations of existing plans, and to do the work "under the direction, supervision, and general control of the respondent's officers." The petitioner built the viaduct under the direction, supervision, and general control of the respondent in compliance with every requirement set forth in the plans and specifications. It did so skilfully, proficiently, and competently. No lack of skill, inattention, incompetence, or negligence in the performance of the work can be attributed to the petitioner. The collapse of span 15 was attributable, not to the quality of the work of the petitioner or to the materials furnished by it, but to the instability of the structure due to an error in its design. There was negligence on the part of the consulting engineers acting on behalf of the

respondent "who could have known of the existence of the latent defect in design, if they had properly applied themselves to the study of the same."

The Commonwealth concedes that the finding that there was error in the design was warranted on the evidence.[1] This concession eliminates a substantial issue in controversy in the court below.

The judge's findings, which were taken in large part from the auditor's report, omitted many facts which are essential to an understanding of the legal questions presented. For these we turn to the auditor's report. Work under the contract commenced in the spring of 1950. The viaduct was to be about three quarters of a mile in length and built on columns, some of steel, and some of reinforced concrete. The understructure comprised forty-four bents. "Bent" is a term given to units which support the viaduct. These units consisted of columns resting in a foundation of reinforced concrete and placed perpendicularly to the roadbed. At or near the top of these columns, steel girders were fastened at right angles. On top of these or attached to them were steel stringers which formed the base of the overpass roadway on which concrete was to be poured. "Stringers" are long steel "I beams" placed between bents and are the "lengthwise carrying members of the structure." They are attached to each other by lateral pieces called "diaphragms." From the top of the girders to the foot of the columns were steel bracings called "cross or X-bracings." These ran from the girders, sometimes diagonally, to the bases of the columns. Another type known as "knee bracings" ran to the side of the column. The area of steel from one bent to another is called a span.

Bents 10 to 16, inclusive, were steel bents; that is, the columns and understructure were to be made of steel instead of concrete. At bents 10, and 12 to 15, inclusive, the

---

[1] The finding of the auditor was that the collapse of span 15 was caused by the accumulation of horizontal thrust at the top of bent 16 to the point where the thrust overcame the resistance of the bent and its anchor bolts, and deflected the top of bent 16 in a northerly direction far enough to deprive the stringers of span 15 of support at the north end.

stringers, "generally seventeen to eighteen in number," were either riveted to the tops of the steel girders or attached to the sides. These were rigid bents, were tied to all the stringers in both directions without provision for movement longitudinally, and were anchored at the base. Bent 16 was a free standing bent. Here the stringers of spans 15 and 16 rested on rockers, which are steel devices, ten and one half inches in height, constructed and erected to permit expansion or contraction of the stringers. Thus, bent 16 was secured in no way at its top, and its only support was the anchor bolting at the footing. The stringers between bents 15 and 16 (span 15) were ninety-five feet long at the east side and seventy-five feet long at the west side. The stringers between bents 16 and 17 (span 16) were from thirty-nine to fifty-three feet long. On top of the stringers a reinforced concrete roadway suitable for six lane traffic was to be poured.

Lehigh began the actual erection of the steel framework in September, 1951. It prepared drawings based on the plan giving the detail of the fabrication of the steel and submitted them to the petitioner, which in turn submitted them to the department of public works for approval. Representing the department as consulting engineer was Thomas Worcester, Inc. (herein called Worcester). This company had drawn the bid plans, which subsequently became the contract plans, and which it certified had been prepared in accordance with contract requirements. Worcester drew all the revisions, and made and approved all the drawings except the shop drawings made by Lehigh.

During construction, agents of the department were present daily. In addition to its consulting engineer there were a resident engineer and three to five inspectors subordinate to him. They gave the petitioner such instructions as they thought necessary, and directly supervised each operation. The petitioner's president, DeMatteo, was familiar with the plans and specifications, observed the work daily, and saw no deviations by Lehigh. He received no complaint of any deviation from any inspector or engineer of the respondent or of Worcester.

On May 20, 1952, the steel erection job had been finished, inspected, and approved. Lehigh removed its equipment and left. The concrete deck on span 16 had not been laid. On May 22, 1952, the end of span 15, where its stringers at bent 16 rested on rockers, slipped off the rockers and dropped to the ground. The rockers also fell. The other end remained hanging, as the stringers were still tied to bent 15. Bents 10, 11, and 12 were sagging. Bent 16 had moved northward toward bent 17.

After the collapse "a terrific jam of traffic occurred," and much concern was felt by the engineers representing the Commonwealth about two large gas mains in the ground under the suspended stringers and the possibility of the stringers giving way entirely and causing explosions dangerous to life and property. Protective measures were taken, and traffic was diverted. A number of conferences took place between DeMatteo and the "engineer of the department."[1] At a conference about the second week in June the "chief engineer"[1] stated that the type of rocker used was not good for this particular structure and was to be redesigned; that possibly one set would be omitted on bent 16; that other changes between bents 10 and 16 would be made; that there was an emergency; that the structure must be corrected and put back in a hurry; and that he desired a new local fabricator to replace Lehigh, because the work must proceed without delay and the redesign might be changed.

About the middle of June, 1952, at a conference of DeMatteo, "Tuttle, the chief engineer," and an associate commissioner of the department, DeMatteo was told that the department had definitely decided to change the plans as to the rockers and in other particulars. The "chief engineer" said that the petitioner should arrange for an erector and a fabricator, should gear itself up to working

[1] We interpret the auditor's references to "engineer of the department," "chief engineer," and "engineer" to mean one Tuttle. DeMatteo testified, and the Commonwealth's brief states, that Tuttle was not the chief engineer, but was assistant to the chief engineer, at the time of the conferences. This variation in description we believe to be unimportant, particularly in view of the contract definition of "engineer," quoted in a footnote below.

nights, Sundays, and holidays, and should keep a strict account of its cost; and that when the work was completed, "they would make out the necessary extra work order." At the "chief engineer's" direction, the petitioner paid Lehigh the balance due of $50,239.77, and Lehigh "quit the job." West End Iron Works Company replaced Lehigh as fabricator, and the erection was performed by Owen J. McGarrahan Company.

At a conference in July DeMatteo was told by the "chief engineer" that Worcester was going to pay one half the cost of the revised construction of bents 10 to 16, inclusive; that Worcester was to pay the petitioner for one half the work to be done by it; that the Commonwealth was to pay the other half; that if Worcester did not pay the petitioner, the Commonwealth would; and that the redesigned plans would cover specific bents and girders, so that the petitioner could segregate its costs.

A conference was held at the Worcester office, attended by the "chief engineer," DeMatteo, and a representative of Worcester, at which DeMatteo was given a memorandum dated July 17, 1952, reading: "Subject: Repair and revision of steel viaduct — Sullivan Square. Erection, dismantling, fabrication and all connected processes, including foundation work, should be divided into two parts: *Part A* This includes the work between bent 13 and the south end of the steel work. It does not include any work on bent 13, nor does it include the work on the rockers and bolsters on bent 11. *Part B* This includes the rest of the work from bent 13 to the north end of the steel viaduct. It includes any work necessary on bent 13 and it includes work on the rockers and bolsters on bent 11." Below the foregoing DeMatteo wrote during the conference, "Submitted to me by Frank Perkins of Thomas Worcester, Inc., ·and agreed to by William Tuttle the same day that cost should be kept separate as described above."

The revised plans for the reconstruction of structural steel work were drafted by Worcester and the respondent. These plans were sent from the office of the "chief engineer" in

covering letters signed by the principal engineer to the petitioner, which gave them to the fabricator. Beginning June 25, 1952, drawings had been submitted to the petitioner showing the redesign of the steel framework.

The auditor summarized the work thereafter performed by the petitioner. Bents 12 and 15 were replaced by new bents, the columns of which were doubled in size. Bracing was increased, and the foundations were strengthened. Bents 10, 13, 14, 16, and 17 were revised. Stiffeners and other strengthening devices were added. A redesigned bent 16 was erected, and a new type of rocker used. The rockers under the span 16 stringers were eliminated in favor of fixed bolsters. Stringers on both sides of bent 11 were stiffened, and rockers of a new design were installed.

The auditor found that the cost of Part A in the memorandum, which was to be paid by Worcester, was $211,711.76, of which $149,862.29 had been paid up to February 19, 1954, and nothing subsequently. On May 18, 1953, the petitioner received written notice from the respondent that no further changes were contemplated. On June 16, 1953, the petitioner submitted its claim for extra work on Part B, amounting to $224,752.81. The "chief engineer" and his assistants examined the petitioner's records and agreed that the gross basic cost was that claimed by the petitioner; but as there were included some debatable items and erroneously computed percentages, the sum was reduced to an agreed total of $195,794.32. The petitioner seeks to recover nothing from the Commonwealth on Part A.

Further findings of the auditor were these. The eventual contract price being in excess of $5,000,000, extra work order No. 57 involved not more than four per cent of that sum. The extra work caused by the revision was well within the scope of alterations and extra work contemplated by the contract. An indication of the maximum amount of extra work permissible without readvertisement is to be found in article 22, which permitted work to be done as an extra provided the "value" was not more than twenty-five per cent of the "original value of the contract."

On this part of the case the judge's concluding statement was, "The court finds that the respondent owes the petitioner the sum of $195,794.32, with interest from December 23, 1953, for the extra work set forth and authorized in extra work order No. 57." An exact copy of this order appears in a footnote.[1]

Incorporated in the contract by reference are a publication entitled, "The American Association of State Highway Officials Standard Specifications for Highway Bridges," and a document of 189 multigraphed pages issued by the department in January, 1941, entitled, "Standard Specifications for Highways and Bridges." The latter contains the following:

"Article 23. Extra Work.

[1] "The contractor shall do any work not herein otherwise provided for when and as ordered in writing by the engineer, such written order to contain particular reference to this article.

[2] "If the contractor claims compensation for extra work not ordered as aforesaid, or for any damage sustained,

---

[1]                    "THE COMMONWEALTH OF MASSACHUSETTS
                         DEPARTMENT OF PUBLIC WORKS
                            100 Nashua St., Boston

Cap 7–7800

            Class Construction                    Fed. No. U–341(1)
            Extra Work Order No. 57
                Dated    December 21, 1953.

Order for Extra Work on Contract in City / of Boston–Somerville (SULLIVAN SQUARE)

To M. DeMatteo Construction Company        CONTRACTOR.

In accordance with Article 23 of your contract No. 4477, dated Dec. 30, 1949, you are hereby ordered to do the following extra work:

Reconstruct 'Part B' of the steel viaduct to conform to the redesigns shown on revision sketches #73, 74, 75, 76, 81, 90 & 94. 'Part B' includes the work from Bent #13 to the north end of the steel viaduct, any work on Bent #13 and work on the rockers and bolsters on Bent # 11.

                        NON-PARTICIPATING                      1–5–54
                                                             Approved.

It is estimated that the cost of this work will be $195,794.32, approximately

Notice of Intention filed 12–24–53 MHC
                                    J. S. BERKOVER
                                    *District Highway Engineer.*
                                    Principal Civil Engineer
Approved, DEC. 23, 1953.
    H. G. GRAY
       *Chief Engineer.*"

he shall, within one week after the beginning of such work or of the sustaining of any such damage, make a written statement to the engineer[1] of the nature of the work performed or damage sustained, and shall on or before the fifteenth day of the month succeeding that in which any such extra work shall have been done or any such damage shall have been sustained, file with the engineer an itemized statement of the details and amount of such work or damage; and unless such statement shall be made as so required, his claim for compensation shall be forfeited and invalid, and he shall not be entitled to payment on account of any such work or damage.

[3] "Such notice by the contractor and the keeping of costs by the engineer shall not in any way be construed as proving the validity of the claim.

[4] "Payment for extra work will be made in accordance with the provisions of article 80."

Article 80, so far as material, reads: "Extra work will be paid for in accordance with the accepted and approved extra work order. . . . The determination of the engineer shall be final upon all questions of the amount and value of extra work."

Neither the judge nor the auditor quoted article 23 in his findings. The judge, however, granted the respondent's request numbered 25, which was based, in part at least, on article 23. This request was: "The natural meaning of the language of the contract in issue as regards alterations and extra work orders is that a written order to do additional work of either kind is required to be given before the work begins, if the respondent is to be liable therefor, and that only such an order is intended."

In the absence of pertinent findings by the judge we cannot reconcile his conclusion that the petitioner is entitled to recover for the work approved in order No. 57 with his granting the respondent's request numbered 25. The order

---

[1] In article 1 of the specifications "engineer" is defined: "The chief engineer of the department acting directly or through an authorized representative, such representative acting within the scope of the particular duties entrusted to him."

was approved December 23, 1953, and the work was completed before May 18, 1953, when the department notified the petitioner that no further changes were contemplated. We accept his general conclusion and disregard the inconsistent ruling on the request, as we are of opinion that there is nothing in article 23 which requires that an order in writing should precede the commencement of extra work. The acceptance of the respondent's argument to the contrary would mean the insertion by implication of additional words in paragraph [1]. Its language, "The contractor shall do any work not herein otherwise provided when and as ordered in writing by the engineer," is not the equivalent of saying that the contractor shall be compensated for extra work only when performed upon the previous written order of the engineer. The reference in paragraph [4] to article 80, which gives to the engineer the final determination of the amount and value of extra work, supports our construction.

We do not regard paragraph [2] as requiring a contrary interpretation. It provides a method for the contractor to protect himself where no written order of the engineer is obtained. At most, it suggests an ambiguity in paragraph [1] in resolving which the judge could give weight to the testimony before him of the principal civil engineer of the department that its practice "to quite a considerable degree" was to issue an extra work order long after work had been completed where the price could not be determined in advance, or even where there was no agreed price. See *Coleman Bros. Corp.* v. *Commonwealth,* 307 Mass. 205, 209–210.

The real purpose of article 23 was to prevent work which is part of the contract being compensated for as an extra. The meaning of article 23 now urged by the Commonwealth would have imposed a serious — and we think an unintended — restraint upon the expeditious handling of an emergency. A finding was warranted that the description and cost of the redesign were impracticable, if not impossible, to foresee and describe before the commencement of the extra work. The judge was not required to find that the emergency was temporary and limited to the time necessary to shore up the

damaged structure. Beyond doubt there was an unexpected indefinite delay in the completion of the accelerated highway program authorized by an emergency law. St. 1949, c. 306.

Request numbered 25 is a paraphrase of a sentence in *Johnson* v. *Norcross Bros. Co.* 209 Mass. 445, 447, where the phraseology of the contract differed from that of the present contract, and where a written order for alterations or additions was never obtained. Cases where there never was a written order of any kind are not in point. See *Crane Constr. Co.* v. *Commonwealth,* 290 Mass. 249; *Lewis* v. *Commonwealth,* 332 Mass. 4.

If the Commonwealth wishes to impose a forfeiture upon contractors for work performed in the circumstances of this case, more precise language should be used. There is nothing requiring a different result in G. L. c. 29, § 20A.

There was no error in the failure to act upon the respondent's motion to exclude findings of the auditor. This was in effect a denial. Separate discussion is unnecessary, as the grounds of the motion are covered in the requests.

There is no merit in the argument that there should have been a formal vote of the commissioners. No request raising this question is pointed out. If required, there was the formal vote of January 5, 1954, which may still be read in the records of the department notwithstanding the attempt to rescind it. That here was no change or modification in the contract disposes of requests numbered 27 and 28. Requests numbered 22, 23, 24, and 26 were based upon a waiver which could not have been made and was not found. Request numbered 24 was also based upon the supposed requirement that extra work must be previously authorized in writing. There was no finding making applicable request numbered 21 to the effect that the department could not settle the petitioner's claim by the extra work order. See *George A. Fuller Co.* v. *Commonwealth,* 303 Mass. 216.

Many requests have been rendered inapplicable by the facts warrantably found and the permissible inferences. Request numbered 6 was based upon an alleged failure of the

subcontractor safely to perform the work of erecting the steel. There was no such finding. The contract was not a guaranty to do the impossible. See *New England Foundation Co. Inc.* v. *Commonwealth,* 327 Mass. 587, 596. In *N. J. Magnan Co.* v. *Fuller,* 222 Mass. 530, the contractor refused to proceed with the contract on the original plans. In the case at bar the judge warrantably found that a new arrangement was made, and a reasonable inference was that this was within the permissible scope of extra work and alterations. Hence it did not fall within G. L. c. 29, § 8A (as amended through St. 1951, c. 401), relating to competitive bidding on State contracts. Requests numbered 32, 33, 34, and 35[1] could not have been given. The opinion in *Morse* v. *Boston,* 253 Mass. 247, 254, described that case as "the making, under the garb of an amendment or alteration of an old and valid contract, a change in its terms and obligations so great as to be the equivalent of a new contract." The auditor's report warranted no such finding in the case at bar. There also was no emergency aspect to the *Morse* case.

The judge ruled in accordance with the Commonwealth's

---

[1] "32. The petitioner cannot recover if it appears that the changes made in the design and plans of the overpass were so extensive as to result in a new and different contract, because the statutes of the Commonwealth permit payment only on such construction contracts of the Commonwealth as have been entered into after competitive bidding, with the lowest responsible and eligible bidder."

"33. Neither the engineer nor the department of public works would have any power or right to authorize the petitioner to do additional work of such nature and magnitude as not to have been within the contemplation of the original contract, plans and specifications, and the doing of such work could legally be provided for only by a separate contract entered into after competitive bidding."

"34. As a matter of law on the facts shown, the changes in the design and form of the viaduct after the collapse were so many and so extensive and the increased cost so great that the changes resulted in an entirely new subject matter of contract so far beyond the scope of the original contract plans and specifications that neither the engineer nor the department had any power or right to authorize the petitioner or anyone else to perform the work except under a new contract entered into after competitive bidding, and the petitioner is chargeable with notice of the statutory limitations on the authority of the public officials of the Commonwealth concerned."

"35. Only such changes and alterations as are directed to furthering the original design and of an incidental kind are permitted under the contract, and all changes destructive of that design or disproportionate in size or amount can legally be provided for only by letting a new contract after competitive bidding."

requests numbered 1, 2, and 19 that the burden of proof was on the petitioner to show that it was entitled to recover and that it had performed its contract. Requests numbered 3, 4, 7, and 8, also relating to the burden of proof, were cumulative. In view of the findings as to the negligence of the consulting engineers of the respondent and the absence of negligence attributable to the petitioner, nothing presently material is presented by requests numbered 9, 11, 12, and 18. Requests numbered 10, 13, 14, 15, 16, 17, and 20, seeking to raise the question whether certain findings were warranted by the evidence, are likewise not material in view of the findings. *Perry* v. *Hanover*, 314 Mass. 167, 175–176. *Rummel* v. *Peters*, 314 Mass. 504, 517–518. *Brodeur* v. *Seymour*, 315 Mass. 527, 529–530. *Liberatore* v. *Framingham*, 315 Mass. 538, 541. *Lawrence* v. *O'Neill*, 317 Mass. 393, 396. *Connell* v. *Maynard*, 322 Mass. 245, 246. *Horton* v. *Tilton*, 325 Mass. 79. Some requests are also open to the objection of asking a ruling upon a portion only of the evidence. They do not merit more detailed discussion.

There was no error in the rulings on the first part of the case.

## The Second Part of the Case.

The controversial items, which appear in paragraph 26 of the petition, divide into five categories. The entire finding of the judge is in one sentence: "The court further finds that the respondent owes the petitioner an additional amount of $260,394.90 with interest from the date of the petition, for work done as set forth in paragraph 26 (excluding subparagraph [g]) of the . . . petition." This was taken nearly verbatim from the report of the auditor, who did not hear all the evidence which the judge did. Hence, there are no findings by the judge on any evidence heard by him. The respondent presented some fifty requests applicable to this part of the case, most of which were denied. Some were granted "in so far as said requests are not inconsistent with the court's findings." This method of ruling upon requests has been often disapproved. *John Hether-*

*ington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 17. *Mericantante* v. *Boston & Maine R.R.* 291 Mass. 261, 263. *Povey* v. *Colonial Beacon Oil Co.* 294 Mass. 86, 93. *Row* v. *Home Sav. Bank,* 306 Mass. 522, 524–525. *Richards* v. *Gilbert,* 336 Mass. 617, 618. As there was nothing but a general finding, the qualified granting of the requests was meaningless, and they must be treated as denied.

It was agreed both before the auditor and before the judge that the petitioner is entitled to recover on three items: (c) cable guard rail protection — $2,082.10; (d) steel pipe and fittings — $2,962.27; and (e) reinforcing steel — $5,400, instead of the $5,633.43 alleged. The petitioner waived (g) revisions to "M. D. C. siphon manhole" — $3,412.50.[1]

As we are not authorized to find facts in an action at law, and on this part of the case are confronted by a finding in one sentence, the burden is now ours, upon an examination of all the evidence, to determine whether harmful error has been shown as to any item by the denial of any request of the respondent.

(*h*), (*j*) to (*n*), *inclusive.* Additional pumping, lights and barricades, wages, insurance, lumber, and equipment costs, "because of extra work performed."

During the course of the work the respondent made numerous revisions in its plans, which the auditor found added to the petitioner's costs in the amounts alleged in the petition: (h) pumping $36,363.10; (j) lights and barricades $18,356.64; (k) wages $57,204.34; (l) insurance $12,444.75; (m) lumber $1,152.03; and (n) equipment $51,933.55. The auditor rejected the respondent's contention that these items represented extra work subject to article 23, which

---

[1] The total obtained by adding the items in paragraph 26 is $261,983.09. Deducting $3,412.50 for item (g), which was waived, the remainder is $258,-570.59. The judge adopted as the amount of damages on the second part of the case the sum of $260,394.90, which was that found by the auditor. The latter's total, and hence that of the judge, involved mathematical errors. Three items reflect errors in carrying forward into the computation of that total, sums found to be due: item (a) $18,065, carried forward as $18,064; item (f) $30,595.48, carried forward as $30,694.08; and item (i) $13,906.11 ($13,906.16 in petition), carried forward as $13,096.11. The total of the auditor's findings is found by adding to be $260,234.90, $160 less than his ultimate findings.

required an order in writing by the engineer referring to that article or the filing of prescribed statements. The auditor stated that article 23 described extra work as "work not herein otherwise provided for." His report contained the following: "The work done in obedience to the revised plans was but an alteration of the work provided for in the contract. It came within the scope of article 22, whereby alterations are permitted when ordered in writing by the engineer, who may supplement them by drawings. The auditor finds as a fact that the work done was an alteration and instructs himself that the signatures of the engineer on the various transmittal letters and his approval stamped on the various revisions of the plans and sketches satisfied the requirements of article 22."

Requests numbered 69 and 70[1] directed the judge's attention to the distinction between alterations and extra work. We think that they should have been granted. The petitioner complains that request numbered 69 misstates article 23. The request refers to a "written statement of claim of extra cost or loss or damage" and to an "itemized written statement of the details of the alleged extra costs or loss or damage." The article requires "a written statement to the engineer of the nature of the work performed or damage sustained" and "an itemized statement of the details and amount of such work or damage." If this request was not strictly accurate, it was sufficient in form to direct the

---

[1] "69. The petitioner cannot recover for any alleged work done, costs incurred, or loss or damage sustained of the kind referred to in request No. 67, resulting from any particular change in the plans and specifications, in any event, unless: (a) A written statement of claim of extra cost or loss or damage, was made by it to the engineer in accordance with article 23 of the Standard Specifications, and (b) An itemized written statement of the details of the alleged extra costs or loss or damage was filed by it with the engineer in accordance with that article.

"70. There is no evidence justifying a finding that the petitioner made a written statement of claim to the engineer in accordance with the provisions of article 23 of the Standard Specifications for the alleged work done, costs incurred or loss or damage sustained of the kind referred to in request No. 67, resulting from any particular change in the plans and specifications, or justifying a finding that the petitioner ever filed with the engineer under that article an itemized written statement of the details of such alleged work, costs incurred, or loss or damage sustained."

Request numbered 67 concerns "labor, insurance, lumber, pumping, lights and barricades, and equipment."

judge's attention to the substance of an issue which was fundamental on this part of the case. See *Morey & Co. Inc.* v. *Sweeney*, 287 Mass. 210, 214, and cases cited; *Adamaitis* v. *Metropolitan Life Ins. Co.* 295 Mass. 215, 220–221; *Higgins* v. *Pratt*, 316 Mass. 700, 711–712. The same rule would apply to request numbered 70.

The definition of "extra work" is to be found in article 1, and is, "Work or materials for which no price agreement is contained in the contract and which is deemed necessary for the proper completion of the improvement." The definition of "alteration" in article 1 is inconclusive: "Change in the form or character of any of the work done or to be done."

Articles 22[1] and 79[2] recognize the contractor's right to compensation where alterations in the original plans result in an increased quantity of work over that contained in the estimates initially submitted to the contractor. The alterations must be ordered in writing by the engineer and are to be paid for at the unit prices established in the contract. The matters named in item (h) and items (j) to (n), inclusive, are not the subjects of such unit prices.

The procedure in article 22 could not be construed to embrace all the additional work necessary to complete the improvement, because there would be left no scope for the operation of article 23, and the definition of extra work in article 1 would be ignored. As we read the contract, there is the expression of a policy that "[w]ork or materials for which no price agreement is contained in the contract" will

---

[1] Article 22 provides in part: "Should it be found desirable by the engineer to make alterations in the form or character of any of the work done, or to be done, the engineer may order such alterations to be made, defining them in writing, supplemented with drawings when in the opinion of the engineer it is necessary, and the alterations shall be made accordingly; provided that in case such alterations increase the cost of the work the contractor shall be remunerated at prices based on prices allowed on the same character of work under the specifications, and in case the alterations shall diminish the cost of the work no allowance will be made for anticipated profits."

[2] "Article 79. Payment for Increased or Decreased Quantities. An increase in quantities of work to be performed (as set forth in articles 3 and 22) will be paid for at the contract unit prices for the actual work done, in the same manner as if such work had been included in the original estimated quantities. No allowance will be made for anticipated profits or underruns in quantities. Changes involving extra work will be paid for as stipulated in the extra work orders."

be paid for only where there is compliance with the provisions of paragraph [1] or paragraph [2] of article 23, quoted in full in the first part of the case. A contractor, before he can be paid for such work or materials, must obtain from the engineer a formal order in writing which expressly refers to article 23, or he must file with the engineer the prescribed statements. But neither of these steps is needed where there is an agreed unit price in the contract, for then the engineer is in a position to know when he orders an alteration what the estimated increased compensation will be. In *Wood* v. *Fort Wayne*, 119 U. S. 312, relied upon by the petitioner, the contractor filed a statement under a procedure similar to article 23, paragraph [2]. The case supports the view we take.

The general conclusion of the auditor was, upon the face of the report, based upon an erroneous ruling of law, and did not warrant the finding of the judge on these items. Upon the evidence a finding could not have been made that item (h) and items (j) to (n), inclusive, were not extra work but were alterations.

(*i*) *Extra work because of change in type and addition of new shear keys.* Shear keys are cleat like appendages beneath the roadway intended to prevent the concrete from sliding. Some were called for by the original plans and specifications. The auditor found that after the keys as designed had been installed, a slipping of the surface was discovered; that the respondent made a redesign of the keys and a further redesign of that redesign; that these changes cost the petitioner $13,906.11; and that the petitioner should recover his increased costs. We interpret the auditor's report as containing a conclusion that these costs were due to an alteration under article 22 and not to extra work under article 23. We learn from the petitioner's brief that "the claim on this item was based on the fabrication of forms under the original design"; and that "These forms had to be discarded and new forms constructed when the plans were altered." The petitioner received no compensation for the work performed in constructing the original forms since the unit prices for

the completed shear keys covered only the forms actually used. When the contractor discovered that new forms were required to replace those forms rendered obsolete by the altered plans, it sustained damage within the meaning of article 23. This item, therefore, is in a category similar to items (h) and (j) to (n), inclusive, which dealt with extra work. We think that, for reasons there outlined, the respondent's requests numbered 63[1] and 64[2] should have been given.

(a). *Excavation of gravel borrow.* These facts are from the auditor's report. In 1950 when the petitioner was working on the low level roadway, the department ordered the petitioner to put cable guard rails around its excavation. These are the subject of item (c) upon which the Commonwealth admits liability. In addition, the department ordered gravel fill to be spread on the slopes of the excavation as a safety measure. The order was contained in a letter of November 24, 1950 (exhibit 60), which referred to contract No. 4477, but did not mention article 23 of "Standard Specifications for Highways and Bridges." When it became necessary to excavate the area in which the gravel fill had been placed, the petitioner excavated the placed gravel, known as gravel borrow, as well as the remainder of the area. The respondent paid the petitioner for excavating the natural gravel but not for removing the gravel borrow, of which there were 14,452 cubic yards. At the unit price in the contract for unclassified excavations of $1.25 a cubic yard, this came to $18,065, which the petitioner should recover.

---

[1] "63. The petitioner cannot recover for any alleged costs incurred, or loss or damage sustained, by it in preparing for doing, or commencing, or for partially doing any part of the work called for by the original plans and specifications for the shear keys, in any event, unless it made a written statement of claim for such costs, loss or damage, to the engineer under article 23 of the Standard Specifications, and filed an itemized written statement of the details thereof with the engineer under said article."

[2] "64. There is no evidence justifying a finding that the petitioner ever made a written statement of claim for the alleged costs incurred, or loss or damage sustained referred to in request No. 63 to the engineer under article 23 of the Standard Specifications, or justifying a finding that the petitioner ever filed an itemized written statement of the details of said costs, loss or damage, with the engineer under said article."

The auditor's report discusses a controversy as to the need for the department's order. This is not a material issue before us, as the petitioner is seeking payment for removal of the gravel borrow, but not for placing it. The respondent argues that the item is for extra work and that it was never ordered in writing by the engineer.

We think that a finding was warranted that this was not extra work, but work which fell within items A2–5 of the contract, which provides: "Work under this item includes all excavation except trench excavation and Class B rock excavation as hereinafter defined . . . . It shall include excavation of fill, ledge, peat, gravel . . . and all other excavation necessary for the performance of this work . . . . This work shall be performed in accordance with the applicable requirements under Sections A–1, A–2 and A–3 and payment for this work will be made at the contract unit price per cubic yard under Item A2–5 Unclassified Excavation . . . ." The auditor found that the petitioner did no trench excavation or Class B rock excavation.

The two requests which expressly refer to gravel borrow were immaterial. Request numbered 49 asked a ruling that there was evidence warranting a finding that the petitioner voluntarily deposited this gravel. Request numbered 51 was based upon article 23, which relates to extra work.

There is no request relating to the respondent's contention that the petitioner's method of computing the amount of excavation was not a compliance with the contract.

(b). *Shoring and bracing along Rutherford Avenue from Sullivan Square to the Boston and Maine Railroad.* This was other work ordered by the department for protection of the public and considered by the petitioner to be unreasonable. The petitioner contends, and we accept its contention, that this is extra work, there being no contract provision for payments for shoring and bracing. The petitioner points to the letter of November 24, 1950 (exhibit 60), as an order in writing to perform this work. That letter, however, does not "contain particular reference" to article 23 of the "Standard Specifications for Highways and Bridges," as

required by that article. Request numbered 53[1] should have been given, and the respondent's exception to its refusal must be sustained.

(*f*). *Balance due on Boston sewer siphon manhole item.* We first recount the "primary facts" in the auditor's report. The original plans and specifications provided for the change of an existing sewer, then four or five feet from the ground, to run under the low level roadway, and by means of two siphoned manholes, a siphon action would be caused to take place and thus maintain sewage flow. The petitioner's bid for erecting these manholes was $17,000 each. The respondent made a revision, which changed the depth of the manholes and the direction of the pipes; eliminated a concrete pipe encasement, some concrete structure, stop planks, and eye bolts; changed the tie-up between the manholes; and involved trench excavation, concrete masonry, and steel reinforcement. An extra work order, dated April 28, 1954,[2] stated that the revised design "eliminates Item D1–5a Siphon Manhole, Type A (Boston)" and provided for payment of $1,370.08. The petitioner by letter "stipulated" that by taking the order it did not accept it as payment in full for the changes. Subtracting from the bid figure the net savings arising from the changes, the cost of each manhole was $15,982.78, or $31,965.56 for both. Crediting the payment of $1,370.08 leaves the net cost to the petitioner as $30,595.48.

The "ultimate facts" found by the auditor were these. The revision sketches and extra work order for the construction of siphon sewer manholes did not entirely eliminate the work set forth in the contract. Article 22 of the "Standard Specifications for Highways and Bridges" empowered the

---

[1] "A proper written statement of claim delivered to the engineer in accordance with the express provisions of article 23 of the Standard Specifications, and a proper itemized written statement of the details of work or damage for which compensation is claimed filed with the engineer, are conditions precedent to the petitioner's right to recover on account of extra work not ordered in writing, or damage sustained by it, and the failure of the petitioner to comply with the requirements of the article deprives it of any right to recover."

[2] The principal civil engineer for the department testified before the judge that this was after the work was completed.

engineer to alter plans provided that increased costs are figured according to contract prices for similar work. Anticipated profit on the alterations is not permitted. The petitioner's costs are figured correctly, and should be paid.

We observe in the contract no unit price applicable to the decrease in the amount of work to be performed as a result of this particular alteration. See articles 22 and 79 quoted above in a footnote.

The evidence warranted the judge in finding that this item had to do with an alteration and not an omission. Requests numbered 38, 57, and 59 based upon the theory that it was an omission were inapplicable. Requests numbered 38 and 57 were otherwise objectionable, for article 81 of the Standard Specifications did not allow the engineer to omit any item but allowed him to omit only items "found unnecessary to the improvement." Request numbered 56, seeking a ruling that the respondent's evidence alone warranted a finding that this item was omitted by the engineer under article 81, could not have been given. It was based on part of the evidence, and it is doubtful whether the finding would have so been warranted. This possibility need not detain us, as it is clear that on this part of the case the judge proceeded along the lines of the auditor's findings, which rendered the request immaterial.

No request raised any question as to the propriety of the method of computation if the subject matter of this item was an alteration.

*Conclusion on the second part of the case.* There was no error in rulings as to items (a) and (f). There was error in rulings as to items (b), (h), (i), and (j) to (n), inclusive.

### CONCLUSION.

The exceptions are sustained. The new trial is to be confined to the second part of the case. The new trial on items (a) and (f) is to be confined to correcting the mathematical errors pointed out in a footnote *supra.*

*So ordered.*