**LEXINGTON INSURANCE COMPANY**
v.
**SEABOARD AIR LINE RAILROAD COMPANY.**
Civ. A. No. 59–425–W.

United States District Court
D. Massachusetts.
April 14, 1960.

John R. Hally, Nutter, McClennen & Fish, Robert W. Meserve, Lawrence B. Urbano, Charles N. Gregg, Jr., Boston, Mass., for plaintiff.

Charles C. Cabot, Herrick, Smith, Donald, Farley & Ketchum, Harold M. Willcox, Boston, Mass., for defendant.

WYZANSKI, District Judge.

This Court's diversity jurisdiction is invoked by a Delaware corporation seeking a declaratory judgment against a Virginia corporation. Plaintiff as insurer entered into a contract of insurance in Massachusetts on January 10, 1958 with defendant as the insured. The contract is for what is popularly called wreck insurance, that is insurance to indemnify a railroad against liabilities for damage to freight cars and their contents caused by collision or derailment. The four issues raised are whether the policy required the railroad not merely to file a proof of a claimed loss, but also as soon as practicable, to report a loss, if so whether in the six losses here involved the railroad made each report in due time, whether there is a limitation of $120,000 upon the insurer's total liability under the policy, and whether in view of the insurer's cancellation of the policy after one year the insured is entitled to a return of two-thirds of the premium.

The policy consists physically of a printed portion and typewritten insertion prepared by the insurer and a typewritten set of special conditions prepared by the insured. The printed portion, with the blanks filled in, shows that the policy was issued for a premium of $40,500, for the term December 31, 1957 to December 31, 1960. It covers the amount of $60,000, being 30% of a $200,000 layer of coverage above $100,000 deductible for "each and every loss." With respect to "report and proof of loss" the printed form states:

"Report and Proof of Loss—The Assured shall as soon as practicable report to this Company or its Agent every loss or damage which may become a claim under this Policy, and shall also file with the Company or its Agent within ninety days from date of loss, a detailed sworn proof of loss. Failure by the Assured either to report the said loss or damage or to file such written proofs of loss as herein provided shall invalidate any claim under this Policy."

With respect to reinstatement, loss appraisal, and cancellation the printed form provides:

"Reinstatement—Every claim paid hereunder reduces the amount insured by the sum so paid unless the same be reinstated by payment of additional premium thereon."

"Loss Appraisal—In case the Assured and this Company, shall fail to agree as to the amount of loss or damage, the same shall be ascertained by two competent and disinterested appraisers, the Assured and this Company each selecting one, and the two so chosen shall first select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately the sound values and

damage, and failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of the loss; the parties thereto shall pay the appraisers respectively selected by them, and shall bear equally the expense of the appraisal and umpire."

"Cancellation—This Policy may be cancelled at any time upon request of the Assured, the Company retaining or collecting the customary short rates for the time it has been in force; or, it may be cancelled by the Company by delivering or mailing to the Assured at the address stated herein five days' written notice of such cancellation and, if the premium has been paid, by tendering in cash, postal money order, or check, the pro rata unearned premium thereon."

In the typewritten special conditions prepared by the insured and added to the printed form paragraphs 8, 9, 12, and 14 provide as follows:

"8. Because it is often difficult, in the event of loss, for the Insured to determine immediately whether loss or damage will exceed the deductible in this policy, the insurer agrees that the interests of the Insured shall not be prejudiced by failure to report any loss at the time of its occurrence, and hereby waives the time limit for filing proofs of loss and the commencement of suits or actions at law, provided the Insured will use due diligence to present proofs as soon after the occurrence as practicable."

"9. In the event of claim or claims against this policy the insurance shall not be reduced and shall be automatically reinstated from the date of the loss to the full amount carried, without payment of additional premium."

"12. In the event of conflict or inconsistency between the printed conditions and the special conditions of this policy, the special conditions shall control."

"14. Either party shall have the right to cancel this policy, but only at midnight December 31, 1958, and at midnight December 31, 1959. Notice of cancellation shall be in writing and shall be received at the home office of the Insured not less than thirty days prior to the date cancellation is to take effect. If canceled by the insurer, the Insured shall be entitled to a pro rata return of premium; if canceled by the Insured, the customary short rate shall be used in computing the return premium. Cancellation shall be without prejudice to any claim or claims originating prior thereto."

In 1958 there were six wrecks on the defendant railroad, occurring respectively on February 16, April 12, April 23, May 7, September 20, and November 29. The insurer received reports of these losses at least as early as March 18, May 9, May 15, May 15, September 30, and December 1. In the last sentence the two references to May 15 represent findings of this Court upon disputed evidence. This Court having considered the veracity of Mr. Hewitt, Sr. and Mr. Hewitt, Jr. (respectively president and vice president of plaintiff), the pencil annotations on Exhibit C, Ex. 17, and Ex. X, is persuaded that both those gentlemen were well aware on May 15 of the third and fourth wrecks, which had occurred on April 23 and May 7.

The railroad's superintendent of insurance had some knowledge of each of these wrecks on the day it occurred or on the next business day. This immediate knowledge was sufficient to indicate the possibility that the loss was in excess of the $100,000 deductible, but it was insufficiently precise to make one confident how much of an insurance claim, if any, was involved. When the railroad did have the precise knowledge its officials transmitted the information orally and later in writing to the insurance broker Roehrs & Company. Roehrs reported to plaintiff's broker, Newell; and

Newell, in turn, reported to plaintiff. For present purposes, there is no reason to recite the dates of the reports to Roehrs and Newell, but if it be material to know them they are covered by stipulation 1.

When the reports reached the insurer they came to the attention of the president and vice-president of the insurer company. Prior to the letter of May 12, 1959 [ex.], written four and a half months after the contract was terminated, neither they nor anyone else representing the insurer made any written or oral suggestion that the reports of wrecks were not timely.

Although on May 15, 1958 Mr. C. C. Hewitt, Sr. and Mr. C. C. Hewitt, Jr., as president and vice-president of the insurer, were fully aware that in the first five months of 1958 there had been four wrecks on the defendant railroad, Mr. Hewitt, Sr. without disclosing the extent of his knowledge, sought and secured, effective May 16, a policy of reinsurance of part of the risk on the contract now in suit. It would have been at least as easy to procure a policy of reinsurance two months earlier when the Hewitts knew of the first wreck. But it was only when, after four wrecks, they realized what a bad bargain they had made that they took this protective action.

The total claims against the insurer for the six wrecks in 1958 may exceed $197,000.

Effective December 31, 1958 the insurer cancelled the policy.

■ It is agreed by both parties that in construing, interpreting, and applying the contract and in connection with all the facts in this case the governing rule is supplied by the law of the Commonwealth of Massachusetts.

The first question is whether the insured railroad was under any obligation, in advance of its proof of loss, to report a loss to the insurer.

■ If the printed portion of the contract had not been supplemented there would have been a duty to report to the insurer or its agent "as soon as practicable." We may assume that under Massachusetts law this would have been a very short period of time. Smith & Dove Mfg. Co. v. Travelers' Ins. Co., 171 Mass. 357, 358, 50 N.E. 516; Wilcox v. Massachusetts Protective Ass'n Inc., 266 Mass. 230, 237, 165 N.E. 429; Sheehan v. Aetna Life Ins. Co., 296 Mass. 535, 538–539, 6 N.E.2d 777; Segal v. Aetna Casualty & Surety Co., 337 Mass. 185, 187–189, 148 N.E.2d 659, 661. The reason is, as Ronan, J. said in the case last cited, "Notice of an accident is required in order to give the insurer an opportunity to investigate the cause and nature of a claim while the facts are still fresh in the minds of the parties."

■ But the force of the printed language was undoubtedly affected by the eighth special condition. It might be argued that since under Massachusetts law a requirement that a report of a loss be made "as soon as was reasonably possible" means the same as a requirement that the report must be "immediate" (see Sheehan v. Aetna Life Ins. Co., 296 Mass. 535, 538, 6 N.E.2d 777, 778; Depot Cafe v. Century Indemnity Co., 321 Mass. 220, 72 N.E.2d 533; Segal v. Aetna Casualty & Ins. Co., 337 Mass. 185, 148 N.E.2d 659) the typewritten eighth special condition, which excuses the insured from reporting a loss "at the time of its occurrence" because the insured cannot determine those facts "immediately", has as a matter of law the effect of completely nullifying the printed requirement. However, this seems to me too mechanical a way of interpreting the particular policy in suit on the basis of Massachusetts precedents involving other policies. It seems to me sounder to look at all the language of the contract and the surrounding circumstances. See Sheehan v. Aetna Life Ins. Co., 296 Mass. 535, 539, 6 N.E.2d 777.

What seems to me the natural interpretation of the language of the whole contract is that the insured is not excused from making a report, but that it need not report immediately at the time the accident occurs. The insured

has a longer time than would have been reasonable under the printed form standing alone. This longer time is allowed to enable the insured to have not merely a loose idea but a fairly accurate estimate as to the exact amount of the damage. The time allowable is intended to permit careful but not final checking by the railroad. Were the allowable time intended merely to permit the railroad to get a preliminary estimate from the railway's first inspectors then condition 8 would have been pointless. For the railroad usually has within 24 hours of an accident a preliminary estimate of losses due to a wreck and a preliminary estimate whether more than $100,000 is involved. If the railroad and the insurer had expected the railroad to report forthwith this preliminary estimate, there would have been no need for condition 8.

Nor in the circumstances of this case is there anything strange about the insurer foregoing a report until details have been fairly well investigated by the railroad. Here we have a policy in which the $100,000 deductible provision and the limited $200,000 layer of coverage indicate how large a stake the railroad has in any loss. Moreover, the losses involved are usually losses of property belonging to third persons whose goods are being carried by the railroad and have been valued by those persons in documents not at the scene of the accident. Furthermore, the railroad itself has extraordinarily expert personnel who can be counted on to make a thorough investigation and who, because of the $100,000 deductible provision and the $200,000 ceiling of insurance, will be inclined more to hold down than to expand damage claims. Finally, the insured might reasonably expect that the railroad would report each accident to ICC and perhaps also local officials. Under these circumstances it is normal for the insurer not to be impatient for a first report of an accident designed to permit the insurer to investigate promptly while the cause and nature of the claim are fresh in the minds of those concerned. The situation is thus quite different from the usual circumstances referred to by Judge Ronan in the above quotation from the Segal case.

In short, this Court interprets the contract as unambiguously imposing on the insured railroad a duty to report a wreck to the insurer only after a reasonable time has elapsed after the railroad had an opportunity to check the details of losses and to consider whether those losses exceeded the deductible amount and if so by approximately how much. On the basis of this interpretation this Court finds as a fact that the time allowable for a report by the insured was not exceeded by the railroad in connection with any of these six accidents.

But if the interpretation which seems clear to me should seem doubtful to others there is another path which leads to the same conclusion I have reached. If it be assumed that on its face the contract is ambiguous, and that the words do not clearly show that the railroad was to have time to make at leisure a fairly detailed survey before giving any report of a wreck, then the conduct of the parties pursuant to the contract shows that they both acted on the basis of a common interpretation to the same effect. That is, the railroad acted in a way which indicated it felt obliged to make a report but not until after it had conducted a fairly careful survey and checked the claim with its broker; and the insurer by its silence acted in a way which indicated it felt no ground for protest at reports filed several weeks after a wreck. Thus there comes into play the familiar rule that "In the construction of written instruments ' * * when the language is open to doubt, and parties whose interests are diverse have from the outset adopted and acted upon a particular construction, such construction will be of great weight with the court, and will usually be adopted by it' ". Maxwell-Davis, Inc. v. Hooper, 317 Mass. 149, 152, 57 N.E.2d 537, 538; New Eng-

land Foundation Co., Inc. v. Commonwealth, 327 Mass. 587, 597, 100 N.E.2d 6; Simons v. American Dry Ginger Ale Co., Inc., 335 Mass. 521, 524, 140 N.E.2d 649. Restatement, Contracts § 235 (e).

■ Furthermore, even if I am wrong in finding that the railroad was timely in giving all six reports, and even if it be assumed that the first report by the railroad was not timely, the silence of the insurer in the face of the first report delivered over a month after the first wreck was a silence which was justifiably relied upon by the railroad in connection with the second, third, fourth, fifth, and sixth reports (each of which was given less than a month after the wreck it covered), and that silence estops the insurer from claiming that the later reports were untimely. Where there is a series of similar reports to be given at times not specifically stated, the recipient's failure to remonstrate that the first report was late justifies the reporter in assuming thereafter that other reports furnished as promptly as the first report are sufficiently timely for the recipient's purposes.

■ It is next necessary to consider the insurer's argument that notwithstanding the railroad's timely reports of the six wrecks, the insurer in connection with these six wrecks cannot be held liable for a total of more than $120,000. This argument is completely answered by the express terms of the policy which impose upon the insurer a maximum liability of $60,000 for "each and every loss", and which provide (in condition 9) that "in the event of claim or claims against this policy the insurance shall not be reduced".

■ Lastly, the insurer contends that although it cancelled the policy when it had been effective for only one-third of its original 3 year term, the insurer is not liable to return two-thirds of the premium. Such a contention cannot be maintained in the face of condition 14 providing that if the policy is "canceled

by the insurer, the Insured shall be entitled to a pro rata return of premium."

Declaratory judgment with costs to be submitted by defendant in accordance with this opinion.