GRANITE STATE MINERALS, INC.

v.

The AMERICAN INSURANCE
COMPANY.

Civ. A. No. 74–1447–T.

United States District Court,
D. Massachusetts.

July 21, 1977.

William G. Young and Elizabeth K. Ainslie, of Bingham, Dana & Gould, Boston, Mass., for plaintiff.

Richard A. Dempsey and Leo F. Glynn, of Glynn & Dempsey, Boston, Mass., for defendant.

FINDINGS OF FACT and
CONCLUSIONS OF LAW

MALETZ, Judge:[1]

*Findings of Fact*

1. This is an action to recover monies allegedly due under an insurance contract. Trial was held by the court without a jury on October 21 and 22, 1976.

2. (a) David F. Mahoney was president of plaintiff Granite State Minerals, Inc. ("Granite State") on August 19, 1972. At the time of the trial he had been president of Granite State for 15 years. The other officers of Granite State report to Mr. Mahoney on all dealings involving the business of Granite State.

(b) Granite State is a distributor and importer of rock salt and sodium chloride located at 227 Market Street, Portsmouth, New Hampshire.

(c) Granite State and its affiliated companies are the largest importers of foreign salt in New England.

(d) The premises of Granite State in Portsmouth consist of approximately three and a half acres of waterfront property located on the Piscataqua River, two and a half acres of which are used for maritime purposes.

3. The Piscataqua River, on which the Granite State premises are located, is a river which is navigable to ocean-going vessels. Granite State operates a pier approximately 250 feet in length along the bank of this river. Granite State receives ocean-going vessels at its pier; approximately 95 percent of the vessels received by Granite State are ocean-going vessels.

4. A Comprehensive General Liability Insurance Policy was issued by the defendant, The American Insurance Company ("the insurance company"), to Granite State. The policy covered the Granite State premises at Portsmouth, New Hampshire at the time in question; it also covered similar premises of affiliated companies in Massachusetts and Maine. The policy was made, issued and delivered in Massachusetts and was in full force and effect between the parties at all relevant times. Granite State had paid the premiums on the policy.

5. (a) On August 19, 1972, Granite State received a cargo of salt from an ocean-going vessel, the JAPAN LINDEN. The JAPAN LINDEN was owned by Japan Line, Ltd. ("Japan Line"). Granite State did not have any contract with Japan Line for the transport of salt.

(b) The cargo of salt which arrived on August 19, 1972 was purchased by Granite State from MaCo, S.A.

(c) MaCo, S.A. of Panama ("MaCo") was represented by one David Quinnlan of Ireland who entered into an oral contract with Granite State to deliver 200,000 tons of salt (value $2,400,000) to Granite State and affiliated companies. Thereafter, MaCo entered into a contract of affreightment with Japan Line to carry the salt. The contract of affreightment contained a safe berth clause.

(d) The record as a whole fails to support the defendant insurance company's contentions (1) that MaCo was only the nominal charterer of the JAPAN LINDEN; and (2) that in actuality plaintiff Granite State chartered the vessel through MaCo. The record establishes to the contrary that MaCo was the charterer.

(e) The arrangements for transportation of the salt to Granite State in Portsmouth were the responsibility of the seller, MaCo. Granite State paid MaCo for the cargo of salt which arrived on August 19, 1972 by a check made out to MaCo. Granite State has never made any payments for salt directly to Japan Line. Mr. Mahoney had not seen the contract of affreightment between MaCo and Japan Line until some time well after August 19, 1972. The seller's agent, Transportation Data, notified Mr. Mahoney prior to the arrival of the cargo that it

---

**1.** Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. § 293(b).

would be arriving in Portsmouth in approximately 30 days on the JAPAN LINDEN. Granite State had not received the JAPAN LINDEN at its Portsmouth pier at any time prior to August 1972.

(f) Other vessels owned and operated by Japan Line had previously moored at the Granite State pier in Portsmouth.

6. Prior to the arrival of the JAPAN LINDEN, Mr. Mahoney was asked by Norton Lilly, agent for the vessel, what the draft was alongside the pier at Granite State, and Mr. Mahoney informed him that the draft was 35 feet at low water. Norton Lilly in turn advised Mr. Mahoney that the draft of the JAPAN LINDEN was 35 feet. Apart from this conversation with the vessel's agent, Mr. Mahoney received no communication prior to the arrival of the JAPAN LINDEN with respect to the vessel's arrival draft.

7. (a) The bottom of the berth at Portsmouth, New Hampshire is stone ledge. At low tide the depth of the water alongside the pier varies from about 30 feet to 37 feet.

(b) Mr. Mahoney knew since 1970 that an area 25 feet along the face of the pier extending out 10 feet was 32 feet deep at low tide. He did not know the exact location of that area. When the JAPAN LINDEN came in, that area was the only one of concern to him. Mr. Mahoney knew that the bottom of the berth was stone ledge.

8. The JAPAN LINDEN arrived at the Granite State pier facility in Portsmouth at approximately 11:00 A. M. on August 19, 1972. It had a forward draft of 33 feet, 6 inches, and an after draft of 35 feet, 2 inches, and carried some 35,000 tons of salt. Mr. Mahoney was present at the vessel's arrival. The JAPAN LINDEN appeared to him to be a fairly new ship.

9. High water at Portsmouth, New Hampshire on August 19, 1972 was about 8:30 A. M. Low water was about 2:30 P. M.

10. (a) Mr. Mahoney testified at his deposition that he anticipated that the JAPAN LINDEN might ground.

(b) As set out in previous findings, Mr. Mahoney was advised by the vessel's agent that the draft of the vessel was 35 feet; he knew that an area along the face of the Granite State pier extending out 10 feet was only 32 feet deep at low tide; he knew that the bottom of the berth was stone ledge; and he knew that the vessel was coming into the pier only three and a half hours before low tide.

(c) Mr. Mahoney expected the JAPAN LINDEN to ground when it docked at the berth only three and one half hours before low tide.

11. At approximately 1:00 or 1:30 P. M., the vessel appeared to be listing to starboard approximately one and one half degrees. Such a small list is scarcely perceptible to the untrained eye. Mr. Mahoney was informed by the first mate of the vessel that the vessel was taking a list. The mate said he thought the vessel had touched and requested Mr. Mahoney to expedite the discharging, which Mr. Mahoney did.

12. Several parts of the JAPAN LINDEN's portside bottom touched ground about one o'clock in the afternoon, some two hours after docking, and the vessel was aground for about two and one half to three hours. The vessel then refloated and remained at the Granite State pier facility for approximately nine days without further incident.

13. The maximum discharging rate of the JAPAN LINDEN at the Granite State pier was 400 tons an hour. The vessel required nine days to discharge at the rate of 4,000 tons a day. Prior to the grounding, approximately 750 tons had been discharged which would raise the vessel some seven inches over her arrival draft. The vessel's draft changed one inch every 115 tons discharged. In order to reduce the draft to 30 feet, some 6,900 tons would have to be discharged and to reduce the draft to 32 feet, 4,140 tons would have to be discharged.

14. (a) Mr. Mahoney received a formal notice of protest with respect to the grounding from the JAPAN LINDEN's master. This notice stated as follows:

I beg to inform you that you will be held responsible so [sic] any damage, hidden or visible, for any and all damages caused my ship by going ground while berthing to the Grannite [sic] State Minerals wharf at 1300 hour 19th Aug. 1972, and I checked depth of around the ship as attached sheet.

I also wish to portest [sic] your not providing safe berth as required by the Charter party.

(b) Mr. Mahoney had received approximately 16 or 17 such notices involving touching over the 22 years he had been operating piers, and in no instance prior to August 19, 1972 had the notice been followed by a damage claim.

(c) Notices of protest are customarily given by prudent masters of vessels whenever an unexpected incident takes place, whether or not the master knows of any actual damage to his vessel.

(d) The notice of protest which was given to Mr. Mahoney by the master of the JAPAN LINDEN was much less formal than those which are customarily given in the maritime industry.

15. (a) Mr. Mahoney saw divers in the vicinity of the JAPAN LINDEN on the day following the grounding and had a conversation with one who inquired as to the position of the vessel with relation to the berth. Mr. Mahoney believes that the divers went down alongside the vessel and he believed, correctly, that the master had sent the divers down. After the divers had gone down alongside the vessel, the master of the vessel had opportunity to talk with Mr. Mahoney but did not report anything to Mr. Mahoney with respect to the divers' findings, nor did he tell Mr. Mahoney that actual damage had been sustained by the vessel.

(b) Mr. Mahoney did not question the officers of the vessel to determine whether the divers reported any damage, nor did he hire any diver or a surveyor.

16. (a) The master of the JAPAN LINDEN had soundings taken alongside the vessel after grounding and supplied Mr. Mahoney with a copy. Mr. Mahoney did not agree with these soundings although he regarded them as close to accurate. He himself did not have any soundings made.

(b) Mr. Mahoney had no knowledge of the exact position of the vessel in the berth where the grounding occurred.

(c) It is most desirable to sound the berth after grounding and to determine the location of the vessel in relation to the pier.

17. (a) A vessel weighing 55,000 tons, including its cargo—which was the weight of the JAPAN LINDEN when it arrived at the Granite State pier—is almost certain to sustain hull damage when it grounds on a stone ledge. In a rare case, the damage to the hull in such a situation might be minimal. Absent gross indications of damage, an expert would reserve his opinion on the extent of damages until the vessel was in drydock.

(b) At the time of the grounding, Mr. Mahoney did not think that actual damage had been done to the hull of the vessel. He did not believe that actual damage had been done because four or five other vessels of similar size and draft had reported touching at the Granite State berth where the bottom is stone ledge and these earlier incidents had never resulted in any damage claim.

(c) At least two of these other vessels did not list at the berth and did not hire divers to inspect the hull.

(d) The JAPAN LINDEN was the first vessel at the Granite State berth to report a grounding; all the other vessels reported a touching.

18. The grounding was a clearly significant occurrence since the JAPAN LINDEN was the first vessel that grounded at the berth and since it listed at the berth and its master hired divers to inspect the hull.

19. If Mr. Mahoney had believed at the time of the grounding that the JAPAN LINDEN had sustained actual damage to her hull, he would have notified the insurance company at that time.

20. Between the time of the JAPAN LINDEN's departure from the Granite State pier facility and November 17, 1972,

Mr. Mahoney heard nothing further from anyone with respect to the vessel. He continued to believe that the JAPAN LINDEN had sustained no actual damage.

21. On November 17, 1972, Granite State received a notice that the JAPAN LINDEN was going into drydock and that it should have a surveyor acting on its behalf as to any possible damage claim that could arise from the grounding at Portsmouth. Mr. Mahoney then notified MaCo and MaCo arranged to have a surveyor present at the drydocking of the vessel. On that same day, Mr. Mahoney also gave notice to the insurance company, both by telephone and by letter. In his letter to the insurance company, Mr. Mahoney suggested that the insurance company have a representative present at the survey in Japan. To Mr. Mahoney's knowledge, this was not done. The claim file of the insurance company, the defendant in this case, with respect to the grounding on August 19, 1972, does not reflect any attempt by the insurance company to find a surveyor to represent the company or its insured, Granite State, at the survey in Japan. There were marine surveyors in Japan on November 17, 1972 who were available to represent the interests of American citizens and corporations.

22. The insurance company sent a Mr. McGrath to Portsmouth at some time between November 27, 1972 and January 22, 1973. Mr. Mahoney observed Mr. McGrath while Mr. McGrath was at the Granite State pier facility. Mr. McGrath took a statement from Mr. Mahoney with respect to Granite State's claim. Mr. Mahoney knows of no other investigation by the insurance company of this claim.

23. At some time after November 17, 1972, Japan Line, owner of the JAPAN LINDEN, asserted a claim against Granite State for damage arising from the grounding. The claim was in the approximate amount of $70,000 and included charges for repairs and detention. Japan Line submitted documents to Granite State in support of its claim. These documents included an excerpt from the master's deck log

recording the grounding of the JAPAN LINDEN, a survey report of George Batstone recording the divers' inspection of the hull, a damage estimate submitted by the shipyard, various bills and invoices submitted by the shipyard, a New England Divers invoice, and an invoice from George Batstone, surveyor. When Mr. Mahoney received these documents, he had no reason to doubt their authenticity or accuracy, except insofar as the detention time being charged to Granite State seemed excessive.

24. At some time after the JAPAN LINDEN's drydocking, Mr. Mahoney received a copy of a survey report, prepared by Cornes & Company, Ltd., with respect to a survey performed on the vessel while in drydock in Japan.

25. The claim of Japan Line with respect to the grounding damage at Portsmouth, New Hampshire was compromised and settled by Granite State upon payment by Granite State to Japan Line of $33,-739.91. The decision to compromise the claim was made by Mr. Mahoney and Mr. Thomas Walsh, his attorney, of the firm of Bingham, Dana & Gould. They concluded from an examination of the claim documents and the Cornes & Company survey report that Granite State was liable to Japan Line. At the time of the compromise settlement of the claim of Japan Line and thereafter, Mr. Mahoney believed that he was, and in fact was, in error when, prior to the arrival of the JAPAN LINDEN on August 19, 1972, he estimated the depth of water alongside the Granite State pier for Norton Lilly, agents for Japan Line, at 35 feet at low tide when he knew that an area along the face of the pier extending out 10 feet was only 32 feet deep at low tide.

26. Mr. Mahoney and his attorney concluded from an examination of the claim documents and the Cornes & Company survey report that a settlement of $33,739.91 was a reasonable settlement of Japan Line's claim. An additional reason for settlement of this claim in this amount was the delay and expense which would be involved in litigation with Japan Line.

27. Prior to the conclusion of the settlement between Granite State and Japan Line, Mr. Mahoney's attorney sent a letter to the insurance company notifying the company of the status of settlement negotiations and of the approximate amount of the probable payment by Granite State and inviting the insurance company to intervene and review the settlement. The insurance company refused to intervene or review the proposed settlement.

28. Given all the facts and circumstances of the present case, the delay of almost three months by Mr. Mahoney in giving notice to the insurance company of the grounding of the JAPAN LINDEN constituted an unreasonable delay.

## Conclusions of Law

A. *Whether Plaintiff is Barred from Recovery for Failure to Give Notice as Soon as Practicable*

■ 1. The policy was made, issued and delivered in Massachusetts and therefore is a Massachusetts contract. E. g., *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *John Hancock Ins. Co. v. Yates,* 299 U.S. 178, 57 S.Ct. 129, 81 L.Ed. 106 (1936).

■ 2. The contract at issue in this case is a comprehensive general liability policy which insures a wharfinger, Granite State, the plaintiff in this case, against liability arising out of its operations. It is thus a maritime contract. *Berwind-White Coal Mining Co. v. City of New York,* 135 F.2d 443 (2d Cir. 1943).

■ 3. In view of the fact that the policy involved here is a marine insurance contract, its notice provisions are governed by state, i. e., Massachusetts law rather than federal law, since there is no federal statutory or judicially established admiralty rule by the Supreme Court covering such notice provisions. *Wilburn Boat Co. v. Fireman's*

*Fund Ins. Co., supra,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. See also, e. g., *Purofied Down Products Corp. v. Travelers Fire Ins. Co.,* 278 F.2d 439, 441, note 1 (2d Cir. 1960); *Walter v. Marine Office of America,* 537 F.2d 89, 94 (5th Cir. 1976); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.,* 540 F.2d 1257, 1261 (5th Cir. 1976). Cf. *Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). See generally Gilmore and Black *The Law of Admiralty* (2d ed. 1975) pp. 48–51, 67–71, 303–305, 464.

4. Under the terms of the policy, Granite State was required to give the insurance company written notice of an "occurrence" as soon as "practicable." [2] In the policy, "occurrence" is defined as "an accident . . . which results during the policy period in . . . *property damage* neither expected nor intended from the standpoint of the *insured.*" [Emphasis in original.]

5. On August 19, 1972, the JAPAN LINDEN, weighing, with its cargo, some 55,000 tons, entered the Granite State berth and grounded on a stone ledge at the berth. In these circumstances, the vessel was almost certain to have sustained hull damage. The vessel took a list and Mr. Mahoney was advised that it was grounded. A letter was immediately issued by the captain of the ship advising that Granite State would be held liable for any and all damages as a result of the grounding. No other vessel using the Granite State berth had ever grounded. The vessel retained divers to determine the extent of the damage. Mr. Mahoney made no inquiry of the officers of the vessel to ascertain the extent of the damage which could not be fully determined until the vessel was drydocked. Granite State did not give any notice to the insurance company. And even though Mr. Mahoney did not agree with the ship's soundings, he did not take counter sound-

2. Paragraph 4(a) of the "Conditions," found on page 3 of the insurance policy provides in relevant part: "In the event of an *occurrence,* written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof . . . shall be given by or for the *insured* to the company or any of its authorized agents as soon as practicable . . ." [Emphasis in original.]

ings to establish the depth of the water at the berth. Nor did Mr. Mahoney know of the exact position of the vessel when she grounded. Without this information or any means of obtaining it from Granite State, the insurance company was highly prejudiced in defending the claim.

6. Mr. Mahoney could not reasonably believe when the vessel grounded on the stone ledge that damages either did not or could not have occurred.

■ 7. Under Massachusetts law, even a well founded belief that the injuries were trivial will not avoid the notice requirement. As stated in *Segal v. Aetna Casualty & Surety Co.*, 337 Mass. 185, 148 N.E.2d 659, 661 (1958):

> The plaintiff's belief that the accident did not come within the coverage of the policy or that no claim would be made did not excuse her from giving the company written notice of the accident. The plaintiff was required to forward to the company a notice of the accident, in addition to a notice of any claim and any summons that might be served upon her. *Potter v. Great American Indemnity Co.*, 316 Mass. 155, 157, 55 N.E.2d 198. It was not for her to determine whether any of those steps were to be omitted if she intended to hold the company liable. It was said in *McCarthy v. Rendle*, 230 Mass. 35, at page 39, 119 N.E. 188, at page 189, L.R.A. 1918E, 111, where the insured had a well founded belief that the injuries were trivial, "It is plain the fact the insured has a reasonable and bona fide doubt as to the existence of any injury or of any liability, cannot be used to deprive the insurer of his contractual right to have an immediate notice of the occurrence of an accident, regardless of the damages that may be claimed to flow from that accident." See also *Malloy v. Head*, 90 N.H. 58, 4 A.2d 875, 123 A.L.R. 941; *Jeannette Glass Co. v. Indemnity Ins. Co.*, 370 Pa. 409, 88 A.2d 407.

■ 8. The purpose of the notice requirement is to give the insurer timely opportunity to investigate the circumstances surrounding a possible claim. An insurer needs to know more than how the accident occurred or extent of damages. It has to investigate immediately to try to prove non-liability and to mitigate damages. See, e. g., *Lexington Insurance Co. v. Seaboard Air Line R. Co.*, 182 F.Supp. 523 (D.C.Mass. 1960); Keeton, *Basic Text on Insurance Law* (1971) § 7.2(a).

■ 9. Under Massachusetts law, a delay in notice approaching three months—as was the case here—defeats recovery as a matter of law. See, e. g., *Depot Cafe v. Century Indemnity Co.*, 321 Mass. 220, 72 N.E.2d 533 (1947) (delay of 46 days by insured in giving notice of accident was, as a matter of law, not in compliance with policy requirement that notice be given as soon as "practicable"); *Potter v. Great American Indemnity Co. of N.Y.*, 316 Mass. 155, 55 N.E.2d 198 (1944). And see *Morse v. Employers' Liability Assurance Corp.*, 323 N.E.2d 769 (Mass.App.1975) (under policy provision requiring notice "as soon as practicable," a delay of two and a half months by insured in giving notice barred recovery).

■ 10. In the present case, the insured was justified in reading the "notice" clause and the definition of "occurrence" clause together and assuming that notice was required as soon as practicable after an accident resulting in property damage. *Ratner v. Canadian Universal Insurance Company*, 359 Mass. 375, 269 N.E.2d 227 (1971). On August 19, 1972 Mr. Mahoney knew or reasonably should have known that in all likelihood damage had been incurred by the JAPAN LINDEN and should have notified the insurance company of the grounding immediately or almost immediately thereafter.

■ 11. (a) Even assuming plaintiff is correct in its contention that maritime law rather than state law is controlling, its failure to give timely notice would bar recovery. Thus, in *Utah Home Fire Ins. Co. v. Mechanical Equipment Co.*, 242 F.2d 513 (5th Cir. 1957), the incident was a vessel's striking of a submerged or floating object. The insured did not notify its insurer following this incident. At some later date

the vessel sank as a result of the earlier incident and the insurance company was then notified. The court discussed the late notice issue as follows (515–516):

Under the terms of the policy it was the duty of the insured to report any loss or misfortune promptly. *This does not mean, however, that every trivial accident that occurred should be reported. An accident which an ordinarily prudent individual acting reasonably would consider, under all the circumstances, as inconsequential and which would not afford the basis of any claim, the insured is not bound to report.* . . . [Emphasis added.]

(b) In the present case, by contrast, the grounding of the JAPAN LINDEN on August 19, 1972 was a clearly significant occurrence and was one which an ordinarily prudent individual reasonably would conclude, under all the circumstances, as consequential. See *Lemar Towing, Inc. v. Fireman's Fund Ins. Co.,* 352 F.Supp. 652 (E.D. La.1972). *Cf. Greene v. Cheetham,* 1963 A.M.C. 123 (S.D.N.Y.1962).

B. *Whether Plaintiff is Barred from Recovery on the Basis that the Occurrence was Expected*

12. The policy applies to property damage resulting from an occurrence. As set forth in conclusion of law 4, "occurrence" is defined as "an accident . . . which results during the policy period in . . . property damage neither intended nor *expected* from the standpoint of the insured." [Emphasis added.]

13. Mr. Mahoney admitted in his deposition that he anticipated the JAPAN LINDEN might ground when it docked. This testimony by Mr. Mahoney in his deposition must be accepted in view of the fact that he knew that the JAPAN LINDEN was docked on a falling tide with a draft three feet greater than the depth of the water at the pier at low tide. The vessel discharged cargo at the rate of approximately 400 tons an hour or 4,000 tons a day. To raise the vessel three feet, some 4,140 tons of cargo would have to be discharged.

Thus it was clear to Mr. Mahoney that his discharging capability of 400 tons an hour (in fact he only discharged 750 tons before the vessel took a list) created an impossibility to discharge sufficient cargo to raise the vessel three feet so that she would clear the bottom.

14. The general liability policy provides coverage for an accident which results in property damage neither intended nor expected by the insured.

15. This provision is from the liability insurance form of 1966. See Keeton, *Basic Text on Insurance Law, supra,* at pp. 292–293, note 6. The provision is designed to make clear that the policy does not cover "highly expectable losses." Keeton, *supra,* at § 5.4(c). In the present case, not only was there a high degree of expectancy by Mr. Mahoney that the JAPAN LINDEN would ground, there was a virtual certainty of damage when the vessel did in fact ground. By express provision, the policy does not cover this risk.

#### Judgment Order

In view of the foregoing, the court concludes as a matter of law that plaintiff is not entitled to recover, and its complaint is hereby dismissed.